1   JORDAN ETH (CA SBN 121617)
    JEth@mofo.com
2   JUDSON E. LOBDELL (CA SBN 146041)
    JLobdell@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California  94105-2482
    Telephone: 415.268.7000
5   Facsimile: 415.268.7522

6   Attorneys for Defendants
    ALTABA INC. (F.K.A. YAHOO! INC.) and MARISSA
7   MAYER

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                     SAN JOSE DIVISION

11

12

13  IN RE YAHOO! INC. SECURITIES          Case No. 17-CV-00373 (LHK)
    LITIGATION
14                                         **YAHOO! INC. AND MARISSA
                                           MAYER'S NOTICE OF MOTION
15                                         AND MOTION TO DISMISS
                                           PLAINTIFFS' SECOND AMENDED
16                                         CLASS ACTION COMPLAINT;
    THIS DOCUMENT RELATES TO: ALL          SUPPORTING MEMORANDUM OF
17  ACTIONS                                POINTS AND AUTHORITIES**

18
                                           Date:    May 3, 2018
19                                         Time:    1:30 PM
                                           Place:   Courtroom 8, 4th Floor
20                                         Judge:   Hon. Lucy H. Koh

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

    PLEASE TAKE NOTICE that on May 3, 2018, at 1:30 p.m., or as soon thereafter as the

4  matter may be heard, in the Courtroom of the Honorable Lucy H. Koh, located at 280 South 1st

5  Street, San Jose, California, Altaba Inc., formerly known as Yahoo! Inc. ("Yahoo" or the

6  "Company"), and Marissa Mayer (collectively with Ronald Bell and Alexander Stamos, the

7  "Individual Defendants," with Yahoo, the "Defendants"), will, and hereby do, move pursuant to

8  Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and the Private Securities Litigation

9  Reform Act of 1995 (the "Reform Act") to dismiss the Second Amended Class Action Complaint

10 for Violations of the Federal Securities Laws (the "SAC"), ECF No. 70-1.

11    This Motion is based on this Notice; the accompanying Memorandum of Points and

12 Authorities; Yahoo! Inc. and Marissa Mayer's Request for Judicial Notice in Support of Motion

13 to Dismiss Plaintiffs' Second Amended Class Action Complaint (the "Request for Judicial

14 Notice"); the Declaration of Judson E. Lobdell in Support of Yahoo! Inc. and Marissa Mayer's

15 Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint (the "Lobdell Decl.")

16 and the exhibits attached thereto; the papers and pleadings on file with the Court; and such other

17 written or oral argument and other materials as may be presented before the Court takes this

18 Motion under submission.

19

**ISSUES TO BE DECIDED**

20    **1.    Failure to Plead Falsity:**  Whether Plaintiffs' claims arising under Section 10(b)

21 of the Securities Exchange Act of 1934 (the "Exchange Act") should be dismissed on the ground

22 that Plaintiffs have failed to plead particularized facts showing that any Defendant made a

23 materially false or misleading statement.

24    **2.    Failure to Plead Scienter:**  Whether Plaintiffs' Section 10(b) claims should be

25 dismissed on the additional independent ground that Plaintiffs have failed to plead particularized

26 facts giving rise to a strong inference that any Defendant acted with scienter when making a

27 materially false or misleading statement.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**3.** **Failure to Plead Loss Causation and Damages:** Whether Plaintiffs' Section 10(b) claims should be dismissed on the additional independent grounds that Plaintiffs have failed to plead the elements of loss causation and damages.

**4.** **Failure to Plead Control-Person Liability:** Whether Plaintiffs' control-person claims under Section 20(a) of the Exchange Act should be dismissed on the grounds that (1) Plaintiffs have failed to plead an underlying Section 10(b) claim; and (2) Plaintiffs have failed to plead facts establishing the element of control.

Dated: March 2, 2018                MORRISON & FOERSTER LLP


                                    By: */s/ Judson E. Lobdell*
                                        JUDSON E. LOBDELL

                                    Attorneys for Defendants
                                    YAHOO! INC. and MARISSA MAYER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

PROCEDURAL BACKGROUND ........................................................................................ 2

THE SECOND AMENDED COMPLAINT'S ALLEGATIONS ........................................ 3

ARGUMENT ........................................................................................................................ 8

I.     Plaintiffs must satisfy exacting pleading requirements to survive a motion to
       dismiss. ..................................................................................................................... 8

II.    Plaintiffs' Section 10(b) Claim Should Be Dismissed. ........................................... 9

       A.    Plaintiffs' Mismanagement Allegations Fail to State a Section 10(b) Claim. ........ 9

       B.    Plaintiffs' Omission Theory Fails to State a Section 10(b) Claim. ....................... 10

       C.    Plaintiffs Fail to Plead False or Misleading Statements. ...................................... 12

             1.    Plaintiffs do not show how Yahoo's statements were rendered false
                   or misleading by the Security Incidents. ................................................... 12

             2.    Challenged statements that are not "objectively verifiable" are not
                   actionable. .................................................................................................. 19

             3.    Statements not made in connection with the purchase or sale of
                   securities are not actionable. ...................................................................... 20

       D.    Plaintiffs Fail to Plead Particularized Facts Giving Rise to a "Strong
             Inference" of Scienter. ......................................................................................... 21

             1.    The 2013 Security Incident ........................................................................ 22

             2.    The 2014 Security Incident ........................................................................ 23

       E.    Plaintiffs' Claims Should Also Be Dismissed for Failure to Plead Loss
             Causation and Damages. ....................................................................................... 30

             1.    Maher has not pled loss causation. ............................................................. 30

             2.    Sutton View's claim is barred by the Reform Act's damages
                   limitation. ................................................................................................... 32

             3.    Talukder's claim is barred by the Reform Act's damages limitation. ...... 33

III.   The Section 20(a) claims should be dismissed. ..................................................... 34

CONCLUSION .................................................................................................................. 35

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................................8

5

6

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ......................................................................................................10

7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................................8

8

9

*Bien v. LifeLock Inc.,*
   No. CV-14-00416-PHX-SRB, 2015 WL 12819154 (D. Ariz. July 21, 2015) ...........16

10

11

*Bonato v. Yahoo Inc.,*
   No. C 11-02732 CRB, 2012 U.S. Dist. LEXIS 113036 (N.D. Cal. Aug. 10,
   2012) ............................................................................................................................15

12

13

*Brodsky v. Yahoo! Inc.,*
   592 F. Supp. 2d 1192 (N.D. Cal. 2008) ......................................................................20

14

15

*Brody v. Transitional Hosps. Corp.,*
   280 F.3d 997 (9th Cir. 2002) ..........................................................................10, 12, 13, 16

16

17

*Cent. Bank of Denver, N.A. v. First Interstate Bank, N.A.,*
   511 U.S. 164 (1994) ......................................................................................................29

18

*Chiarella v. United States,*
   445 U.S. 222 (1980) ......................................................................................................10

19

20

*In re ChinaCast Educ. Corp. Sec. Litig.,*
   809 F.3d 471 (9th Cir. 2015) ........................................................................................29

21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
   856 F.3d 605 (9th Cir. 2017) ........................................................................................25

22

23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.,*
   632 F.3d 751 (1st Cir. 2011) .............................................................................23, 28, 29

24

25

*City of Westland Police and Fire Ret. Sys. v. Sonic Solutions,*
   No. C 07-0111 CW, 2009 U.S. Dist. LEXIS 33339 (N.D. Cal. Apr. 6, 2009) .........35

26

*In re Cutera Sec. Litig.,*
   610 F.3d 1103 (9th Cir. 2010) .................................................................................19, 20

27

28

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) .................................................................................30, 32, 33

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ...............................................................................................1, 21

*In re Foundry Networks, Inc. Secs. Litig.,*
    No. C00-4823 MMC, 2002 U.S. Dist. LEXIS 28070 (N.D. Cal. June 6, 2002)......17

*Gaines v. Haughton,*
    645 F.2d 761 (9th Cir. 1981)....................................................................................9

*Glazer Capital Mgmt., LP v. Magisti,*
    549 F.3d 736 (9th Cir. 2008)............................................................................18, 25

*In re Galena Biopharma, Inc. Sec. Litig.,*
    117 F. Supp. 3d 1145 (D. Or. 2015) .......................................................................35

*In re GlenFed, Inc. Sec. Litig.,*
    42 F.3d 1541 (9th Cir. 1994)...................................................................................8

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992)...................................................................................18

*In re Heartland Payment Sys., Inc. Sec. Litig.,*
    No. 09-1043, 2009 U.S. Dist. LEXIS 114866 (D.N.J. Dec. 7, 2009) ................13, 15

*Howard v. Hui,*
    No. C92-3742 CRB, 2001 U.S. Dist. LEXIS 15443 (N.D. Cal. Sept. 24, 2001)....34

*In re Impac Mortg. Holdings, Inc. Sec. Litig.,*
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) .................................................................34

*In re Impax Labs., Inc. Sec. Litig.,*
    No. C 04-04802 JW, 2008 U.S. Dist. LEXIS 104485 (N.D. Cal. Apr. 17, 2008) ...34

*In re Int'l Rectifier Corp. Sec. Litig.,*
    No. CV 07-02544-JFW, 2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23,
    2008) .......................................................................................................................29

*In re Invensense, Inc. Sec. Litig.,*
    No. 15-cv-00084-JD, 2016 U.S. Dist. LEXIS 40607 (N.D. Cal. Mar. 28, 2016)....34

*Janus Capital Grp., Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011) ...............................................................................................21

*In re LeapFrog Enters., Inc. Sec. Litig.,*
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ............................................................17, 20

*In re LifeLock, Inc.*,
690 Fed. App'x 947 (9th Cir. 2017)..................................................21, 29

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002)......................................................23

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005)........................................................9

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)......................................................9, 30

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..................................................................1, 10

*McGann v. Ernst & Young*,
102 F.3d 390 (9th Cir. 1996)........................................................20

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000).....................................................32, 33

*Metzler Inv. GmbH v. Corinthian Colls.*,
540 F.3d 1049 (9th Cir. 2008)..............................................12, 22, 31

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
881 F.3d 750 (9th Cir. 2018) ....................................................30, 32

*Neborsky v. Valley Forge Composite Techs., Inc.*,
No. 13-CV-2307-MMA (BGS), 2014 U.S. Dist. LEXIS 104681 (S.D. Cal. July
29, 2014) ..................................................................................35

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
54 F.3d 1424 (9th Cir. 1995)........................................................29

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)................................................ *passim*

*In re Oak Tech. Sec. Litig.*,
No. 96-20552 SW, 1997 U.S. Dist. LEXIS 18503 (N.D. Cal. Aug. 1, 1997).........35

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
50 F. Supp. 3d 1328 (C.D. Cal. 2014) ..............................................30

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010)........................................................30

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014)...........................................9, 19, 20, 31

*Paracor Fin., Inc. v. GE Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996)......................................................................................33

*Petrie v. Elec. Game Card, Inc.*,
   SACV10-00252 DOC (RNBx), 2011 WL 13130015 (C.D. Cal. Oct. 19, 2011)......................29

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014)......................................................................23, 27, 28

*In re Read-Rite Corp.*,
   335 F.3d 843 (9th Cir. 2003)......................................................................................13

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017)........................................................................ *passim*

*Richardson v. Oppenheimer & Co. Inc.*,
   No. 2:11-cv-02078-GMN-PAL, 2014 U.S. Dist. LEXIS 43419 (D. Nev. Mar. 31, 2014) ..............................................................................................................35

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012)........................................................................ *passim*

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001)......................................................................12, 13, 22

*Roots P'ship v. Lands' End, Inc.*,
   965 F.2d 1411 (7th Cir. 1992)......................................................................................34

*Santa Fe Industries, Inc. v. Green*,
   430 U.S. 462 (1977)......................................................................................1, 9

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)......................................................................................21

*In re Silicon Storage Tech.*,
   No. C 05-0295 PJH, 2006 U.S. Dist. LEXIS 14790 (N.D. Cal. Mar. 10, 2006) ......................9

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
   365 F.3d 353 (5th Cir. 2004)......................................................................................30

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996)......................................................................................5, 8

*Stoneridge Inv. Partners v. Scientific-Atlanta*,
   552 U.S. 148 (2008)......................................................................................12, 29

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007)......................................................................................5, 9, 21, 22

*In re U.S. Aggregates, Inc. Sec. Litig.*,
   235 F. Supp. 2d 1063 (N.D. Cal. 2002) ..............................................................25, 27

*In re Union Exploration Partners Sec. Litig.*,
   No. CV-90-3125, 1992 U.S. Dist. LEXIS 9013 (C.D. Cal. June 18, 1992) ............................11

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002)........................................................................9, 13, 25

*In re Veritas Software Corp. Sec. Litig.*,
   496 F.3d 962 (9th Cir. 2007)...........................................................................32

*In re Vivendi Universal, S.A. Sec. Litig.*,
   123 F. Supp. 3d 424 (S.D.N.Y. 2015)..............................................................32, 33

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   MDL No. 2672 (JSC), 2017 U.S. Dist. LEXIS 1109 (N.D. Cal. Jan. 4, 2017) ................34, 35

*Warth v. Seldin*,
   422 U.S. 490 (1975) ....................................................................................34

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007)...................................................................29

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)..............................................................9, 21, 22, 26, 34

**Statutes**

15 U.S.C. § 78u-4............................................................................... *passim*

**INTRODUCTION**

In 2013 and 2014, hackers breached Yahoo's cybersecurity systems, resulting in the theft of account information from Yahoo user accounts (the "Security Incidents").  The hackers responsible for the 2014 Security Incident were working at the direction of the Russian government's Federal Security Service (the "FSB").  Those responsible for the 2013 attack still have not been identified.

In this action, Plaintiffs seek to dress up a state-sponsored cybersecurity breach as a securities fraud on the theory that Yahoo's CEO, General Counsel, and Chief Information Security Officer ("CISO") covered up the Security Incidents in order to artificially inflate Yahoo's stock price and defraud Yahoo's investors.  Plaintiffs' Second Amended Complaint ("SAC"), however, falls far short of pleading the elements of a Section 10(b) claim.

Much of the SAC consists of allegations that Yahoo failed to adequately safeguard its users' data.  As the Supreme Court held in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479-80 (1977)—and has repeated many times since—such allegations of mismanagement (even if true, and here they are not) do not give rise to a Section 10(b) claim.

Plaintiffs also decry what they describe as Yahoo's "brazen failure to disclose" the breaches to users and investors, insisting that "Yahoo was required to timely and accurately disclose all of its security vulnerabilities."  (¶¶ 36-61.[1])  These allegations—in addition to being inaccurate—are irrelevant because the private right of action under Section 10(b) covers false or misleading ***statements***, not failures to disclose.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011).

When Plaintiffs eventually get around to challenging Defendants' statements—seventy-five pages into the SAC—the statements they identify are not actionable for multiple reasons. Most of the statements concern Yahoo's aspirational "commitment" to user privacy, its efforts to increase network security, and its warnings that these efforts had not always succeeded in the

---

[1] Unless otherwise noted, all "¶" references are to the SAC and all Exhibit references are to the Declaration of Judson E. Lobdell in Support of Yahoo! Inc. and Marissa Mayer's Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint ("Lobdell Decl.").

past, and might not succeed in the future.  Nothing in the SAC shows these statements were false.  In any event, unverifiable expressions of optimism do not give rise to a private right of action under Section 10(b) and the act of enumerating risk factors does not give rise to a duty of elaboration.

Additionally, Plaintiffs fail to plead facts establishing the required "strong inference of scienter"—a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)—on the part of any Defendant.  The context and content of the statements Plaintiffs challenge undermine any inference of scienter.  The facts Plaintiffs allege do not support a strong inference that the Individual Defendants made any of the challenged statements with an intent to deceive investors.

Finally, the SAC should also be dismissed because it does not plead loss causation or recoverable damages on the part of any Plaintiff.  Lead Plaintiff Maher never held Yahoo stock— only stock options—and sold all these options before either Security Incident was disclosed.  The claims of Lead Plaintiff Sutton View Partners LP ("Sutton View") and named plaintiff Nafiz Talukder are barred by the Reform Act's 90-day "bounce back" provision, which imposes a statutory limit on recoverable damages.

## PROCEDURAL BACKGROUND

This litigation commenced on January 24, 2017, with the filing of the first of two complaints asserting claims under Sections 10(b) and 20(a) of the Exchange Act based on the Security Incidents.  (ECF No. 1.)  On April 24, 2017, this Court consolidated the two actions under the caption *In re Yahoo! Inc. Securities Litigation*, and appointed Ben Maher ("Maher") and Sutton View as Lead Plaintiffs.  On June 7, 2017, Lead Plaintiffs filed their First Amended Class Action Complaint, including Nafiz Talukder as a "named plaintiff" (with Lead Plaintiffs, "Plaintiffs").  ("FAC").

On July 28, 2017, Yahoo and Ms. Mayer filed their Motion to Dismiss Plaintiffs' FAC (ECF No. 46), joined by Messrs. Bell and Stamos (ECF Nos. 48-49), with a hearing set for October 19, 2017.  The hearing on Defendants' motion to dismiss the FAC was postponed due to ongoing settlement discussions between the parties.

1   On November 22, 2017, the Court *sua sponte* granted Plaintiffs leave to amend the FAC,

2   denied without prejudice as moot the Defendants' pending motion to dismiss, and set a briefing

3   schedule for any motions to dismiss the SAC.  (ECF No. 65.)

4   On January 23, 2018, the Parties informed the Court that Lead Plaintiff Sutton View and

5   named Plaintiff Nafiz Talukder had reached a settlement agreement with Defendants on behalf of

6   the class, subject to formal documentation and Court approval.  (ECF No. 68.)  The Parties

7   further informed the Court that Maher had not agreed to the settlement and that they intended to

8   file a motion by March 2, 2018, requesting that the Court enter an order granting preliminary

9   approval of a class-wide settlement in this Action and the Parties requested that, in light of the

10  settlement, the Court vacate the deadlines set in its November 22, 2017 Order.  (*Id.*)  The Court

11  denied this request.  (ECF No. 69.)

12  As ordered by the Court, Plaintiffs filed the SAC on February 2, 2018.  (ECF No. 70.)

13  **THE SECOND AMENDED COMPLAINT'S ALLEGATIONS**

14  **I.     THE PARTIES**

15  **A.     Plaintiffs and the Plaintiff Class**

16  Lead Plaintiffs Maher and Sutton View purport to have purchased Yahoo securities

17  between May 2, 2014, and April 15, 2016.  (Ex. 27.)  Maher's purported purchases of Yahoo

18  securities during this period consisted solely of options.  Maher's first option purchase took place

19  on May 2, 2014, and all of Maher's options were sold or expired by February 19, 2016.  (*See*

20  Ex  27 at 13-3, pp. 1-6; ¶ 13.)  Plaintiff Talukder purports to have purchased Yahoo securities

21  between November 4, 2014 and August 26, 2016.  (Ex. 28.)

22  Plaintiffs seek to represent a class consisting of all those who purchased or otherwise

23  acquired Yahoo common shares between April 30, 2013, and December 14, 2016 (the "Class

24  Period"), and were damaged upon the revelation of the alleged corrective disclosures.  (¶ 418.)

25  **B.     Defendants**

26  **1.     Yahoo**

27  Defendant Yahoo! Inc. ("Yahoo") was, throughout the Class Period, a Delaware

28  corporation headquartered in Sunnyvale, California.  Yahoo provided a variety of internet search,

communication, and entertainment services to users around the world.  (¶ 19.)  Its most valuable assets, however, were not its operating business, but rather its significant equity stakes in the Chinese internet company Alibaba Group Holdings Limited ("Alibaba") and the Japanese internet company Yahoo Japan Corporation (collectively, the "Asian Equity Investments").  (Ex. 14 at Annex 1-1, the "Proxy".)

On July 25, 2016, Yahoo announced that it had entered into an agreement to sell its operating business to Verizon Communications, Inc. ("Verizon"), leaving Yahoo as an investment company holding the Asian Equity Investments (the "Sale Transaction").  (¶ 359.) The Sale Transaction closed on June 13, 2017, whereupon which Yahoo renamed itself Altaba Inc.  (Ex. 15.)

Throughout the Class Period, Yahoo's stock traded on the NASDAQ.  Yahoo's stock price increased from $24.73 per share on the first day of the Class Period to $40.91 per share on the final day of the Class Period.[2]  During the 90-day period following Plaintiffs' final alleged corrective disclosure, *see* 15 U.S.C. § 78u-4(e), Yahoo's stock price increased from $41.23 per share on January 6, 2017, to $46.23 per share on April 4, 2017.

### 2.      The Individual Defendants

Defendant Marissa A. Mayer served as CEO of Yahoo for the entire Class Period and remained CEO until the Sale Transaction closed.  (¶ 15.)  Defendant Ronald S. Bell served as General Counsel and Secretary of Yahoo from August 13, 2012, until March 1, 2017.  (¶ 16.) Defendant Alexander Stamos served as Yahoo's CISO from March 10, 2014, to approximately June 30, 2015, when he left Yahoo to join Facebook.  (¶ 17.)

## II.      FACTUAL BACKGROUND

The facts set out below are derived from the SAC, the documents cited in and incorporated by reference into the SAC, and other judicially noticeable documents.  *See* Request for Judicial Notice.

---

[2] Yahoo's stock prices during the Class Period are charted in the Lobdell Declaration, Ex. 16.

## A.      The 2014 Security Incident

Beginning in 2014, FSB officers directed hackers to gain unauthorized access to the networks of companies providing internet-related services and to steal user information from those networks.  (Ex. 17[3] at ¶ 1.)  Yahoo was one of the targeted companies.  (*Id.* at ¶ 2.)

In October 2014, the hackers attempted to obtain user account information by attacking Yahoo's Account Management Tool ("AMT"), which they used to access user account information of twenty-six specifically targeted users.  (¶ 204; Ex.17 at ¶ 26.)  Following discovery of the AMT hack, Yahoo consulted with law enforcement and notified the twenty-six targeted users.  (¶ 204.)

In November and December 2014, these hackers broadened their attack by seeking to steal user information stored in Yahoo's user database ("UDB").  (Ex. 17 at ¶ 25.)  The information stored in the UDB included account user names, phone numbers, and certain security information tied to user accounts.  (*Id.* at ¶ 22.)  The hackers were eventually able to steal files from a backup copy of the UDB and exfiltrate (that is, transfer off of Yahoo's network) the UDB backup files to computers under their control.  (*Id.* at ¶ 25.)  The first incident of data exfiltration allegedly occurred on November 10, 2014.  (¶ 142.)  Combining control of the stolen UDB files with access to the AMT, the hackers could search the UDB files and identify specific accounts of interest to the FSB.  (Ex. 17 at ¶¶ 33-34.)  Yahoo later determined that the exfiltrated UDB backup files contained certain user account information for at least 500 million users.  The exfiltrated data did not include user payment card data or bank account information.  (¶ 185.)

On July 25, 2016, Yahoo and Verizon publicly announced the Sale Transaction, subject to approval by Yahoo's shareholders.  Shortly thereafter, Yahoo learned of posts on the "dark web" offering to sell Yahoo user credential data.  (¶ 169.)  After investigating with an outside forensic

---

[3]  Plaintiffs' allegations reference the Justice Department's March 2017 criminal indictment at length throughout the SAC.  (*E.g.*, ¶¶ 109-22.)  Plaintiffs' express reliance on allegations in the indictment results in the contents of the indictment being incorporated by reference into the SAC as if fully set forth therein.  *See Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

1   expert, the Company could not substantiate the claims.[4]  (¶ 203.)

2            Following the investigation, Yahoo intensified an ongoing broader review of the

3   Company's network and data security.  (*Id.*)  On September 22, 2016, based on its review and

4   further investigation by outside forensic experts, Yahoo disclosed that a copy of certain user

5   account information for at least 500 million user accounts was stolen from Yahoo's network in

6   late 2014.  (*Id.* ¶¶ 185, 371; Ex. 19.)

7            Following Yahoo's disclosure of the 2014 Security Incident, Verizon and Yahoo

8   discussed the potential impact of the 2014 Security Incident on Yahoo's operating business.

9   (Ex. 14 at 56.)  On November 8, 2016, representatives of Yahoo and Verizon reached a

10  preliminary understanding whereby the Sale Transaction would proceed with no price reduction

11  and the two companies would split certain liabilities arising out of the 2014 Security Incident.

12  (*Id.* at 57.)

13           On November 9, 2016, Yahoo disclosed that its Board had formed an Independent

14  Committee to investigate, among other things, the scope of knowledge within the Company

15  regarding the 2014 Security Incident, the extent to which certain user account information had

16  been accessed, and other issues related to the Company's data security measures.  (¶ 203.)

17           On March 1, 2017, Yahoo filed its FY 2016 Form 10-K, which provided a summary of the

18  conclusions of the Independent Committee's investigation:[5]

19  •  "[T]he Company's information security team had contemporaneous knowledge of the 2014
       compromise of user accounts."  (¶ 204.)
20

21  •  In late 2014, senior executives and relevant legal staff were aware that a state-sponsored
       actor had accessed twenty-six user accounts by exploiting the Company's AMT.  (¶ 204.)

22  •  "[A]s of December 2014, the information security team understood that the attacker had
23     exfiltrated copies of user database backup files containing the personal data of Yahoo users
       but it is unclear whether and to what extent such evidence of exfiltration was effectively
       communicated and understood outside the information security team."  (¶ 204.)
24

25  _____

26  [4]  According to the *Motherboard* article cited by Plaintiffs (¶ 171), the hacker responsible for the
    dark web advertisement stated that the records were "from 2012 most likely."  (Ex. 18.)

27  [5]  In the same filing, Yahoo also disclosed that, based on additional technical investigation, the
    Company believed that approximately 32 million user accounts had been the victim of a "cookie
28  forging" attack by the same Russian government-sponsored hackers.  (Ex. 20 at 45.)

- The "relevant legal team had sufficient information to warrant substantial further inquiry in 2014, and they did not sufficiently pursue" the issue.  (Ex. 20 at 47.)

- Yahoo's Board and Audit Committee "were not adequately informed of the full severity, risks, and potential impacts of the 2014 Security Incident and related matters."  (*Id.* at 47.)

- There was no finding of "an intentional suppression of relevant information."  (*Id.* at 47.)

The SAC disputes certain of these conclusions and alleges that "all material facts" concerning the 2014 Security Incident were reported to members of Yahoo's senior management throughout late 2014 and 2015.  (¶¶ 147-51.)  The SAC also alleges that Mr. Stamos and his colleague, Ramses Martinez, told Yahoo's Audit and Finance Committee "everything they knew" about the 2014 Security Incident in April and June 2015.  (¶¶ 152-63.)

### B.    The 2013 Security Incident

On November 9, 2016, Yahoo disclosed that its outside forensic experts were investigating new data files that were provided to Yahoo by law enforcement and were claimed by a third party to contain Yahoo user account data.  (Ex. 21 at 40.)  On December 2, 2016, Verizon advised Yahoo that it would defer completion of the Sale Transaction until Yahoo had made further progress in the investigation of these data files.  (Ex. 14 at 57.)

On December 14, 2016, Yahoo disclosed its belief, based on analysis of the data files, that an unauthorized party had exfiltrated data associated with more than one billion user accounts in August 2013 (i.e., the 2013 Security Incident).  (¶ 102.)  Despite its investigation, Yahoo was unable to identify the source of the intrusion in the 2013 Security Incident, but did conclude that the 2013 Security Incident was likely distinct from the 2014 Security Incident.  (¶ 408.)

On February 20, 2017, Yahoo and Verizon executed a series of amendments to the Sale Transaction Agreement that provided, among other things, that: (1) the purchase price contained in the original Sale Transaction Agreement would be reduced by $350 million to $4.475 billion; (2) Verizon would release certain claims related to the Security Incidents; and (3) Yahoo and Verizon would split responsibility (50/50) for certain post-closing liabilities related to the Security Incidents.  (Ex. 14 at 60, Exhibits A-2, C.)

On October 3, 2017, Verizon announced that "[s]ubsequent to Yahoo's acquisition by

1  Verizon, and during integration, [Verizon] recently obtained new intelligence and now believes,

2  following an investigation with the assistance of outside forensic experts, that all Yahoo user

3  accounts were affected by the August 2013 theft," i.e., the 2013 Security Incident.  (Ex. 22.)

4  **C.      Plaintiffs' Allegations of False and Misleading Statements**

5  Plaintiffs assert securities fraud claims against all Defendants under Section 10(b), and

6  control-person claims against Ms. Mayer, Mr. Bell, and Mr. Stamos under Section 20(a).  Much

7  of the SAC is based on the allegation that Yahoo's cybersecurity defenses were inadequate and

8  that these alleged inadequacies and the Security Incidents were not contemporaneously disclosed.

9  Plaintiffs also list approximately sixty-two statements made between April 30, 2013, and

10  September 22, 2016, which they allege were misleading in light of the alleged cybersecurity

11  inadequacies and the Security Incidents.  (¶¶ 244-372.)  For the Court's convenience, the

12  challenged statements are set out in the Chart of Statements Alleged To Be False or Misleading in

13  the Second Amended Class Action Complaint, attached hereto as Appendix A (the "Statement

14  Chart").  Plaintiffs allege that, starting on May 18, 2015, and continuing through January 5, 2017,

15  the "truth" about the Security Incidents was "revealed" to the market through twenty alleged

16  corrective disclosures.  (¶¶ 373-412.)

17  **ARGUMENT**

18  **I.      PLAINTIFFS MUST SATISFY EXACTING PLEADING REQUIREMENTS**
**TO SURVIVE A MOTION TO DISMISS.**
19

20  To survive a motion to dismiss, Plaintiffs must meet the pleading requirements of Rule 8,

21  Rule 9(b), and the Reform Act with respect to each element of their securities fraud claims.  First,

22  the allegations must meet the plausibility standard of Rule 8.  *Bell Atl. Corp. v. Twombly*, 550 U.S.

23  544, 555 (2007).  Under this standard, although factual allegations are assumed to be true, the

24  Court must not indulge "unwarranted inferences."  *Stac Elecs.*, 89 F.3d at 1403.  Further,

25  allegations that are conclusory or speculative should be disregarded.  *Ashcroft v. Iqbal*, 556 U.S.

26  662, 663 (2009); *Twombly*, 550 U.S. at 555.

27  Second, Plaintiffs must also satisfy the requirements of Rule 9(b), which "requires

28  particularity as to the circumstances of the fraud," including the "time, place, persons, statements

1    made, [and] explanation of why or how such statements are false or misleading." *In re GlenFed,*

2    *Inc. Sec. Litig.*, 42 F.3d 1541, 1547 n.7 (9th Cir. 1994).

3         Third, Plaintiffs must satisfy the "exacting pleading requirements" imposed by the Reform

4    Act, which requires a plaintiff to plead falsity, scienter, and loss causation "with particularity."

5    *Tellabs*, 551 U.S. at 313; 15 U.S.C. § 78u-4(b)(1)-(2); *Zucco Partners, LLC v. Digimarc Corp.*,

6    552 F.3d 981 (9th Cir. 2009); *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605

7    (9th Cir. 2014).  "The purpose of this heightened pleading requirement was generally to eliminate

8    abusive securities litigation and particularly to put an end to the practice of pleading fraud by

9    hindsight."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002).

10        **II.        PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED.**

11        To state a claim under Section 10(b) of the Exchange Act, a complaint must allege facts

12   sufficient to establish (1) that the defendant made a materially false or misleading statement; (2)

13   that the defendant did so with scienter; (3) that the statement was made in connection with the

14   purchase or sale of a security; (4) that the plaintiff relied upon the statement; (5) that the fraud

15   caused the plaintiff economic loss; and (6) that the plaintiff is entitled to recover damages.  *Loos v.*

16   *Immersion Corp.*, 762 F.3d 880, 886-87 (9th Cir. 2014); *Livid Holdings Ltd. v. Salomon Smith*

17   *Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  The SAC fails to plead these elements.

18                  **A.        Plaintiffs' Mismanagement Allegations Fail to State a Section 10(b)**
                                **Claim.**
19

20        Much of the SAC is devoted to allegations that the Individual Defendants and others

21   mismanaged Yahoo by "refus[ing] to invest" in data security and by employing "outdated,"

22   "substandard," "poor," "broken and unsuitable" security measures.  (*E.g.*, ¶¶ 2, 62-95.)  This

23   theory fails to state a Section 10(b) claim.

24        The Supreme Court has repeatedly held that "Congress by [enacting] § 10(b) did not seek

25   to regulate [conduct] which constitute[s] no more than internal corporate mismanagement."

26   *Santa Fe Indus.*, 430 U.S. at 479-80.  Allegations that the Defendants should have done more to

27   secure the Company's networks are simply allegations "of fiduciary misconduct and internal

28   mismanagement," which are not "sufficient to trigger liability under the Exchange Act." *In re*

1    *Silicon Storage Tech.*, 2006 U.S. Dist. LEXIS 14790, at *66 (N.D. Cal. Mar. 10, 2006); *see also*

2    *Gaines v. Haughton*, 645 F.2d 761, 779 n.33 (9th Cir. 1981) (federal securities laws do not

3    provide a cause of action for corporate mismanagement).

4         At most, the SAC's allegations show that, like many technology companies, Yahoo was

5    under constant attack from cybercriminals who were, on occasion, successful.[6]  (¶ 85.)  That is

6    why, as discussed in more detail below, Yahoo warned of the risk of cyberattacks and informed

7    investors that "[s]ecurity breaches or unauthorized access ***have resulted in and may in the future***

8    ***result in*** a combination of significant legal and financial exposure."[7]  (*See, e.g.*, ¶ 308 (emphasis

9    added).)

10              **B.       Plaintiffs' Omission Theory Fails to State a Section 10(b) Claim.**

11        Plaintiffs also assert that Defendants engaged in securities fraud through a "brazen failure

12   to disclose" the Security Incidents.  (¶ 2; *see generally* ¶¶ 36-61.)  It is black letter law, however,

13   that a plaintiff cannot state a Section 10(b) claim by alleging that a defendant simply omitted

14   material information.  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

15   "[A]bsent a duty to disclose, an omission does not give rise to a cause of action under § 10(b) and

16   Rule 10b-5."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard*

17   *Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17

18   (1988)); *Matrixx*, 563 U.S. at 43-46.  Under these principles, a plaintiff can state an omissions

19   claim under Section 10(b) only where disclosure is "necessary 'to make . . . statements made . . .

20   not misleading,'"  *Matrixx*, 563 U.S. at 44, or in particular circumstances (absent here) where a

21   "relationship of trust and confidence between parties to a transaction" requires disclosure of the

22   information.  *Chiarella v. U.S.*, 445 U.S. 222, 230 (1980).

23        Plaintiffs assert that Yahoo was under a duty to disclose the Security Incidents by virtue of

24

25   _____

     [6]  Plaintiffs' allegations related to Yahoo Japan (¶ 83) in May 2013 are irrelevant to this action.
26   Yahoo Japan is an entirely separate company from Yahoo—it was not part of the SPA and
     remains publicly traded on the Tokyo Stock Exchange.

27   [7]  Moreover, in many instances, the SAC acknowledges that attacks on Yahoo's networks were
     publicly disclosed.  Plaintiffs concede that Yahoo publicly discussed with the popular media a
28   July 2012 security incident (¶¶ 67-72).

1   guidance released by the staff of the SEC's Corporation Finance Division regarding disclosures

2   relating to cybersecurity risks and incidents.  (¶ 40.)  That is incorrect.  The guidance Plaintiffs

3   cite is largely an interpretation of Regulation S-K.  (Ex. 23 at 1, n.4-8.)  Regulation S-K, however,

4   does not give rise to a private right of action for failure to disclose under Section 10(b).  *NVIDIA*,

5   768 F.3d at 1054-56.  *A fortiori*, staff guidance concerning the regulation does not do so.[8]

6         Plaintiffs also assert that state law requirements to notify users of data breaches created a

7   duty to disclose under Section 10(b).  (¶ 36.)  Plaintiffs, however, have not pled facts that show

8   any state law violation.  Their allegations in this regard are entirely conclusory (*see id.*) and

9   should, therefore, be disregarded.  In any event, allegations of state law violations do not state a

10   private right of action under Section 10(b).  Plaintiffs cannot simply point to notification

11   obligations owed to individual consumers and attempt to "dress them up as federal securities

12   violations by including phrases such as 'Defendants failed to disclose.'"  *In re Union Expl.*

13   *Partners Sec. Litig.*, 1992 U.S. Dist. LEXIS 9013, at *10 (C.D. Cal. June 18, 1992) (rejecting

14   claim based on alleged violation of duties under state law).  Rather, a "duty to disclose must be

15   separately shown according to the principles set forth by the Supreme Court in *Basic* and *Matrixx*

16   *Initiatives*."  *NVIDIA*, 768 F.3d at 1056.

17         Plaintiffs cite Yahoo's policies relating to disclosing software "security vulnerabilities" on

18   its security-focused Tumblr page (¶¶ 44-45) and Yahoo's user-facing notification policy relating

19   to account targeting by state-sponsored actors (¶ 39), asserting that they create an actionable duty

20   under Section 10(b).  They do not.  Yahoo's security vulnerability disclosure policy was not

21   directed to investors.  (Ex. 24.)  Rather, it was designed to disclose vulnerabilities to "peers in the

22   Internet community who may also be affected by" security vulnerabilities in "software that Yahoo

23   ha[d] written [and] in the common open-source and commercial products that [Yahoo] use[d] on

24   [its] network."  (*Id.*)  Similarly, Yahoo's user notification policy said nothing about disclosure to

25   investors, but rather states that Yahoo will notify an individual user—not the public—if the

26   _____

27   [8]  Plaintiffs also allege that SEC Form 8-K imposes a duty to disclose all material events.  (¶ 42.)
   Form 8-K contains no such requirement.  *See* SEC Form 8-K, available at
   https://www.sec.gov/files/form8-k.pdf.  In any event, as stated above, violations of SEC rules do

28   not give rise to a private right of action under Section 10(b).

1    Company "strongly suspect[s] that [the user's] account may have been targeted by a state-

2    sponsored actor." (¶ 39; Ex. 25.)  In fact, the discussion of this policy expressly stated that "[i]n

3    order to prevent the actors from learning our detection methods, *we do not share any details*

4    *publicly about these attacks*." (Ex. 25 (emphasis added).)

5         Allowing investors to enforce state consumer notification laws and consumer-directed

6    company policies in a private securities fraud class action would be an unprecedented and

7    impermissible expansion of the implied private right of action under Section 10(b), well beyond

8    the boundaries established by Congress.  *Cf. Stoneridge Inv. Partners v. Scientific-Atlanta*, 552

9    U.S. 148, 165 (2008) (courts may not extend the implied right of action under Section 10(b)

10   beyond its current reach).

### C.    Plaintiffs Fail to Plead False or Misleading Statements.

#### 1.    Plaintiffs do not show how Yahoo's statements were rendered false or misleading by the Security Incidents.

14        Plaintiffs identify the statements they challenge as false or misleading in paragraphs

15   243-372 of the SAC.  None of Plaintiffs' challenged statements—each of which is set out in the

16   Statement Chart—is actionable under Section 10(b), for the reasons set out below.

17        To plead falsity under the Reform Act, a plaintiff must "specify each statement alleged to

18   have been misleading [and] the reason or reasons why the statement is misleading." *Metzler Inv.*

19   *GmbH v. Corinthian Colls.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (quoting 15 U.S.C.

20   § 78u-4(b)(1)).  Further, a plaintiff must plead "contemporaneous statements or conditions"

21   showing the "misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423,

22   432 (9th Cir. 2001).

23        As discussed above, a plaintiff cannot meet this burden merely by identifying information

24   omitted from a challenged statement and claiming the omission rendered the statement

25   incomplete.  "As long as the omissions do not make the actual statements misleading, a company

26   is not required to disclose [the omitted information] . . . even if investors would consider the

27   omitted information significant." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th

28   Cir. 2012); *see Hewlett-Packard*, 845 F.3d at 1278; *Brody*, 280 F.3d at 1006; *NVIDIA*, 768 F.3d

1    at 1054.  Pleading falsity thus requires alleging "contemporaneous statements or conditions" that

2    are "***necessarily inconsistent***" with a challenged statement.  *In re Read-Rite Corp.*, 335 F.3d 843,

3    846, 848 (9th Cir. 2003) (emphasis added); *accord Brody*, 280 F.3d at 1006; *Ronconi*, 253 F.3d at

4    432 (rejecting an allegation that a statement was misleading at the time made when a certain fact

5    was not necessarily inconsistent with the defendant's statement); *see Vantive*, 283 F.3d at 1089

6    (interpreting *Ronconi*).  Plaintiffs fail to meet this burden for any of the challenged statements.

7                          **a.      Statements of policy and commitment**

8            Many of the statements Plaintiffs attack set out Yahoo's general commitment to its users'

9    privacy and security.  For example: "we take the security of our users very seriously" (¶ 254;

10   Stmt. No. 5), and "Yahoo is committed to gaining your trust" (¶¶ 345, 364; Stmt. Nos. 49, 58).

11   Additional statements in this category are set out in the Statement Chart under Tab A.[9]

12           The fact that Yahoo was the victim of a security breach sponsored by Russian intelligence

13   agents is not "necessarily inconsistent" with the Company taking "the security of [its] users very

14   seriously."  And the statement that "Yahoo is committed to gaining your trust" did not signify that

15   Yahoo never experienced security incidents.[10]  *See Hewlett-Packard*, 845 F.3d at 1276 (rejecting

16   allegations challenging ethics policy).  As courts analyzing similar claims have found, "[t]he fact

17   that a company has suffered a security breach does not demonstrate that the company did not

18   'place significant emphasis on maintaining a high level of security.'"  *In re Heartland Payment*

19   *Sys., Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 114866, at *14-19 (D.N.J. Dec. 7, 2009).

20           Similar allegations were rejected in *Hewlett-Packard*.  There, the plaintiffs challenged

21   statements by HP and its CEO touting HP's corporate code of conduct (the "SBC"), alleging that

22   the statements were misleading because the CEO failed to disclose that he was violating the code.

23   *Hewlett-Packard*, 845 F.3d at 1275-78.  The Ninth Circuit affirmed dismissal on the ground that

24   the "promotion of ethical conduct at HP did not reasonably suggest that there would be no

25   violations of the SBC by the CEO or anyone else."  *Id.* at 1278.  These statements did not,

26   _____

27   [9]  Stmt. Nos. 1, 4, 5, 7-9, 13-16, 18-24, 26-32, 34, 36-40, 42, 44, 46-47, 49-51, 53-54, 58-60.

28   [10]  In fact, the risk of security breaches is one that Yahoo specifically disclosed in SEC filings that
     Plaintiffs reference in the SAC.  (*See, e.g.*, ¶¶ 268, 313.)

1   therefore, "affirmatively create an impression of a state of affairs that differs in a material way

2   from the one that actually exists."  *Id.* at 1278.

3        The claims here are significantly weaker than those in *Hewlett-Packard*, including

4   because Yahoo consistently warned throughout the Class Period that the Company "may be

5   unable to anticipate [hacking] techniques or implement adequate preventative measures" and that

6   "[s]ecurity breaches or unauthorized access ***have resulted in and may in the future result in*** a

7   combination of significant legal and financial exposure."  (*See, e.g.*, ¶¶ 268, 313; Stmt. Nos. 11,

8   35 (emphasis added).)

9        Plaintiffs also repeatedly argue that Defendants deceived investors by stating Yahoo had

10  "physical, electronic, and procedural safeguards that comply with federal regulations to protect

11  personal information" about users.  (¶¶ 2, 5, 22, 244, 302, 345, 364; *see also* ¶¶ 347, 366; Stmt.

12  Nos. 1, 29, 49, 51, 58, 60.)  But the SAC ***does not identify any federal regulation*** on these topics

13  that Yahoo allegedly violated; much less plead particularized facts showing such a violation.

14       Indeed, the ***only*** specific security deficiency alleged in the SAC is that Yahoo employed

15  MD5 encryption in 2013.  (¶ 86.)  But the documents the SAC relies upon state that Yahoo

16  discontinued use of MD5 "[i]n the summer of 2013," shortly after the start of the Class Period.

17  (Ex. 26.)  Plaintiffs do not allege that MD5 violated "federal regulations," nor that Yahoo misled

18  investors with respect to its use of MD5 in the four challenged statements made before use of this

19  encryption method was discontinued.  (Stmt. Nos. 1-4.)

20               **b.**     **Statements about unrelated cybersecurity topics**

21       Plaintiffs also challenge statements addressing cybersecurity issues with no apparent

22  connection to the Security Incidents.  (*See* Statement Chart at Tab B.[11])  For example, Plaintiffs

23  claim that Defendants misled investors by stating that:

24  •  "We successfully block the vast majority of malicious or deceptive *advertisements* with
    which bad actors attack our network, and we always strive to defeat those who would
25    compromise our customers' security."  (¶ 286; Stmt. No. 20 (emphasis added).)

26  •  "[S]omething that works really well for [Yahoo] is that the leaders of all our business units
    have a real-time dashboard to see how many bugs are han[g]ing over them and our CEO

27  _____

28  [11]  Stmt. Nos. 5, 7, 10, 13, 15-16, 20-21, 23, 26-27, 30-31, 34, 36-37, 39, 42, 44-45, 50-51, 54,
    58-60.

1    every week confronts that number." (¶ 298; Stmt. No. 27.)

2    • "[W]e continue to protect our mail users with new investments in spam and phishing
       detection." (¶ 329; Stmt. No. 42.)

3           Plaintiffs plead no facts showing that any of these statements was necessarily inconsistent

4    with the unrelated Security Incidents. (Ex. 17 at ¶¶ 21-23 (explaining technical methods of

5    access).) Juxtaposing the Security Incidents with these unrelated issues does not plead falsity.

6    *See, e.g., Bonato v. Yahoo Inc.*, 2012 U.S. Dist. LEXIS 113036, at *30-34 (N.D. Cal. Aug. 10,

7    2012) (rejecting claim that a disclosure relating to value of one business group created duty to

8    disclose value of an unrelated business group), *aff'd, Pension Trust Fund for Operating Eng'rs v.*

9    *Yahoo! Inc.*, 611 Fed. App'x 387 (9th Cir. Cal. 2015); *Heartland*, 2009 U.S. Dist. LEXIS 114866,

10   at *16-17 (finding that "general observations concerning trends in encryption standards . . . [and]

11   adopt[ion] [of] new technology" had "nothing to do with" the cyberattack underlying plaintiffs'

12   securities fraud claim).

13          Plaintiffs cannot establish falsity through conclusory allegations that Yahoo's

14   "information security protocols were inadequate" or that Yahoo failed to utilize an "up-to-date

15   and secure encryption scheme." (¶ 243.) These allegations do not conflict with Yahoo's

16   statements, which accurately discuss specific improvements to the Company's network and

17   information security systems. *See Heartland*, 2009 U.S. Dist. LEXIS 114866, at *17-19

18   (descriptions of how company's security systems function do not imply that company "had never

19   experienced any security problems"). Aside from Plaintiffs' concession that Yahoo discontinued

20   use of MD5 in the summer of 2013 (¶ 86; Ex. 26), the SAC pleads no facts relating these

21   statements to the methods Yahoo used to encrypt user account information in its user database or

22   to the Security Incidents. Nor does the SAC plead any facts showing that Yahoo's efforts to

23   combat spam and scams were not industry-leading at the time. Further, statements concerning

24   Yahoo's ongoing efforts to improve security (e.g. "***currently working*** to bring all Yahoo sites ***up***

25   ***to this standard***"; "***work hard to deploy*** the best possible technology"; "***encouraging*** our partners

26   to ensure that any data running on our network is secure, and ***improving*** the security of the

27   overall web ecosystem") are also not contradicted by the SAC's allegations. (Stmt. Nos. 13, 14,

28

1   24 (emphasis added).)

2          Plaintiffs' claims all boil down to the argument that, by discussing issues under the

3   umbrella of cybersecurity, Yahoo thereby imposed a duty upon itself to disclose *everything* under

4   that umbrella, including the Security Incidents.  That is not the law.  "[A] company is not required

5   to disclose every safety-related [issue], even if the company discloses some safety-related [issues]

6   and even if investors would consider the omitted information significant."  *Rigel Pharm.*, 697

7   F.3d at 880 n.8.

8                          **c.       Statements about cybersecurity risks**

9          Plaintiffs also challenge fourteen statements that appear in Yahoo's SEC filings as "Risk

10  Factors."  (*See* Statement Chart at Tab C.[12])  Plaintiffs do not explain, however, how these

11  warnings were false or misleading.

12         As with any statement, a risk factor warning does not give rise to Section 10(b) liability

13  merely because it is incomplete; rather, the warning itself must "create an impression of a state of

14  affairs that differs in a material way from the one that actually exists."  *Brody*, 280 F.3d at 1006;

15  *accord Rigel Pharm.*, 697 F.3d at 880 n.8; *Bien v. LifeLock Inc.*, 2015 WL 12819154, at *8-10

16  (D. Ariz. July 21, 2015).

17         Yahoo's Risk Factors explained:

18             If our security measures are breached, our products and services may be perceived
               as not being secure, users and customers may curtail or stop using our products
19             and services, and we may incur significant legal and financial exposure. . . .
               ***Security breaches or unauthorized access have resulted in and may in the***
20             ***future result in a combination of significant legal and financial exposure***,
               increased remediation and other costs, damage to our reputation and a loss of
21             confidence in the security of our products, services and networks that could have
               an adverse effect on our business.
22

23  (¶ 268; Stmt. No. 11 (emphasis added).)  Plaintiffs allege that Yahoo's risk factor warnings, while

24  undeniably accurate, triggered a duty under Section 10(b) to disclose more.  As explained above,

25  however, the private right of action under Section 10(b) does not impose a duty of

26  completeness—with respect to risk factor warnings or otherwise.  *Rigel Pharm.*, 697 F.3d at 880

27  n.8; *Brody*, 280 F.3d at 1006; *Bien*, 2015 WL 12819154, at *10.  In *Rigel*, the Ninth Circuit

28  [12]  Stmt. Nos. 2-3, 6, 11, 17, 25, 33, 35, 41, 43, 48, 52, 55, 57.

1    affirmed dismissal, explaining that "a company is not required to disclose every safety-related

2    result . . . even if the company discloses some safety-related results and even if investors would

3    consider the omitted information significant." *Rigel Pharm.*, 697 F.3d at at 881 n.8.

4         Plaintiffs have identified nothing in Yahoo's risk factor warnings that was necessarily

5    inconsistent with the Security Incidents.  The warnings do not, therefore, give rise to a Section

6    10(b) claim.[13]

7                                    **d.     Representations in the Stock Purchase Agreement**

8         On July 25, 2016, Yahoo announced the Sale Transaction and filed the 74-page Stock

9    Purchase Agreement (the "SPA") with Verizon as an exhibit to a Form 8-K.[14]  (¶ 359.)  Plaintiffs

10   challenge one paragraph of the SPA, which stated that there had "not been any incidents of . . .

11   Security Breaches, unauthorized access or unauthorized use of any of Seller's or the Business

12   Subsidiaries' information technology systems . . . that could reasonably be expected to have a

13   Business Material Adverse Effect [an 'MAE']."  (¶¶ 6, 216, 368, 417; Statement Chart at Tab D,

14   Stmt. Nos. 56, 61.)

15        This statement is not actionable.  The Proxy Statement and Form 8-K that attached the

16   SPA explicitly stated that the representations and warranties were ***not*** intended to describe the

17   actual state of affairs at Yahoo, but rather were intended ***only*** to allocate risk between the parties

18   to the Agreement:

19           These representations and warranties were made solely for the benefit of the other
20           party to each such Sale Transaction Agreement and (i) ***are not intended to be***
             ***treated as categorical statements of fact,*** but rather as a way of allocating risk to
21           one of the parties if those statements prove to be inaccurate, (ii) may have been
             qualified in the Sale Transaction Agreements by confidential disclosure schedules
22           that were delivered to the other party . . . , (iii) may be subject to standards of
             materiality applicable to the parties that differ from what might be viewed as
23           material to stockholders, and (iv) were made only as of the date of the applicable

24   ────────────────────

25   [13]  District courts within the Ninth Circuit have frequently rejected claims such as these based on
     risk factor warnings.  *See, e.g.*, *In re Foundry Networks, Inc. Secs. Litig.*, 2002 U.S. Dist. LEXIS
26   28070, at \*23 (N.D. Cal. June 6, 2002) (Plaintiffs "cannot state a claim based on the disclosure of
     risk factors") (citing *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996)); *In re LeapFrog
27   Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048-49 (N.D. Cal. 2007).

     [14]  The SPA was also attached to Yahoo's Preliminary Proxy filed on September 9, 2016.  (¶¶ 6,
28   216, 368; Ex. 13.)

> Sale Transaction Agreement. . . . Accordingly, ***you should not rely on the representations, warranties, and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of Yahoo*** or Verizon.

(Ex. 12 at 3 ("Additional Information") (emphasis added); Ex. 14 at 68 (emphasis added).) Plaintiffs offer no explanation for how, given this specific instruction not to do so, any reasonable investor could rely on this statement as "the actual state of facts or condition of Yahoo."[15]

Moreover, the SAC does not plead that this contractual allocation-of-risk provision was false. Plaintiff pleads no facts regarding the financial or business effect of the Security Incidents as of July 2016, let alone facts showing that the Security Incidents met the MAE threshold.

Additionally, this statement cannot form the basis of a securities fraud claim because no Plaintiff, in fact, relied upon it. As discussed in Section II.E below, neither Lead Plaintiff purchased Yahoo securities after the SPA was filed. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992) ("We need not determine whether this statement is misleading because it was issued after [plaintiff] bought his stock and thus could not have affected his stock's . . . market price or his decision to buy on that date.").[16]

### e.    September 22, 2016 Press Release

On September 22, 2016, Yahoo issued a press release, also filed with the SEC on Form 8-K, disclosing that "a copy of certain user account information was stolen from the company's network in late 2014 by what it believes is a state-sponsored actor" and that Yahoo believed "that information associated with at least 500 million user accounts was stolen." Yahoo recommended that "users who haven't changed their passwords since 2014 do so." (¶ 185; Stmt. No. 62.) The SAC alleges that this press release was misleading because it (i) suggested that "data exfiltration was only discovered through a 'recent' investigation"; (ii) stated that the stolen account information "may have included names, email addresses, telephone numbers, dates of birth,

---

[15]  The allegations here, thus, differ from those in *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 741 (9th Cir. 2008), where the court rejected the argument that representations in a publicly filed merger agreement could never give rise to Section 10(b) liability. Here, unlike in *Glazer*, Yahoo explicitly advised investors that they should not rely on the terms of the SPA as a statement of fact regarding the condition of the Company.

[16]  The same is true of Statement No. 62 made on September 22, 2016.

1    hashed passwords" when this information "had in fact been stolen"; and (iii) "failed to disclose

2    that the Company knew that the Russian hackers had been minting cookies."  (¶¶ 186-89.)  These

3    allegations fail to support a securities fraud claim.

4         First, the fact that Yahoo "confirmed" data exfiltration through a "recent investigation"

5    does not signify that Yahoo was unaware of the intrusion prior to this time.[17]  Second, the

6    statement that the stolen account information "may have included" specific data was true, and

7    there are no allegations that "names, email addresses, telephone numbers, dates of birth, hashed

8    passwords" were stolen for each of the 500 million accounts affected by the Security Incident.

9    Third, Plaintiffs have alleged no facts showing that the fact that "the Russian hackers had been

10   minting cookies" was material to investors, much less explaining how the purported omission of

11   this information rendered the press release false and misleading.  Indeed, Plaintiffs concede that

12   this information was disclosed in Yahoo's next filing with the SEC, on November 9, 2016, but do

13   not allege that this disclosure was "corrective."  (¶ 180 n.54.)

14                    **2.      Challenged statements that are not "objectively verifiable" are**
                            **not actionable.**
15

16        Most of the statements addressed above are not actionable for the additional reason that

17   they are not "objectively verifiable."  The Ninth Circuit has repeatedly held that such

18   statements—which may be described as "corporate optimism," "puffery," "vague," or

19   "aspirational"—are not actionable because reasonable investors do not rely upon them.  *See, e.g.*,

20   *Hewlett-Packard*, 845 F.3d at 1276; *Apollo*, 774 F.3d at 606; *In re Cutera Sec. Litig.*, 610 F.3d

21   1103, 1111 (9th Cir. 2010).

22        **Corporate Optimism (Statement Chart Tab E):** Plaintiffs challenge twenty-four

23   statements of corporate optimism, such as "Yahoo! takes your privacy seriously" (¶ 302, Stmt.

24   No. 29), "we've had our users' back when it comes to security and transparency" (¶ 290, Stmt.

25   No. 23), or Ms. Mayer's comment during the Q2 2015 earnings call that "we took an industry-

26   leading step towards a password-free future with the announcement of Yahoo! Account Key . . .

27

28   ────────────────
     [17]  Importantly, Plaintiffs do not identify any disclosure correcting this "misstatement" or any
     "loss" caused by corrective disclosures on this point.

to provide a fast, convenient, and secure way to access your Yahoo! accounts" (¶ 336; Stmt. No. 45).  (*See* Statement Chart at Tab E.)  Such statements are not actionable.  *Cutera*, 610 F.3d at 1111; *LeapFrog*, 527 F. Supp. 2d at 1049-50 (dismissing claims based on optimistic statements about financial performance, consumer demand, and strengthening of company systems and functions).

**Vague (Statement Chart Tab F):**  Additionally, thirteen challenged statements are "vague and provide[] nothing concrete upon which a plaintiff could reasonably rely."  *Apollo*, 774 F.3d at 606-07; *see* Statement Chart at Tab F.  For example: "We've worked hard over the years to earn our users' trust and we fight hard to preserve it . . .  There is nothing more important to us than protecting our users' privacy," "I have a real sense, and everyone in the legal department thinks that our main job is to protect our users.  We have to stand up for them, because if we don't, nobody else is in a position to do that."  (¶¶ 260, 271; Stmt. Nos. 7, 12).  The challenges to these statements also fail as a matter of law.  *Cutera*, 610 F.3d at 1111; *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) (quoting *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) ("generalized, vague and unspecific assertions" are not actionable)).

**Aspirational (Statement Chart Tab G):**  Plaintiffs challenge twenty-two statements reflecting Yahoo's aspirational data security policy goals and commitments.  For example, "[a]t Yahoo, our users' security is paramount, and we continue to update our policies and practices to keep our users' accounts and data secure," or Ms. Mayer's comment that Yahoo! Account Key "also makes it significantly easier to protect our users' accounts going forward."  (¶¶ 311; Stmt. No. 34; s*ee* Statement Chart at Tab G.)  As above, this type of statement cannot form the basis of a securities fraud claim under Section 10(b) and Rule 10b-5.  *Hewlett-Packard*, 845 F.3d at 1276.

### 3. Statements not made in connection with the purchase or sale of securities are not actionable.

Many of the statements Plaintiffs challenge (*see* Statement Chart at Tab H[18]) are not

---

[18]  Stmt. Nos. 1, 4, 5, 9, 13-15, 23, 26-31, 34, 37-40, 44-45, 49-51, 54, 58-60.

1   actionable for the additional reason that they were not made "in connection with" the purchase or

2   sale of securities.  To give rise to a Section 10(b) claim, a statement must be made "in a manner

3   reasonably calculated to influence the investing public." *McGann v. Ernst & Young*, 102 F.3d

4   390, 397 (9th Cir. 1996).

5   　　Statements to users in Yahoo's customer-facing policies (e.g., Stmt. Nos. 30, 31, 51), to

6   security professionals at data security conferences (Stmt. Nos. 26, 27), and in blog posts

7   discussing terrorist attacks (Stmt. No. 53) were not made in such a manner.  While misstatements

8   in such contexts "might have some probative value in an action based on consumer protection

9   laws, [] they have none in a case alleging investor fraud."  *In re LifeLock, Inc.*, 690 Fed. App'x

10   947, 954 (9th Cir. 2017).

11   　　　　　**D.**　　**Plaintiffs Fail to Plead Particularized Facts Giving Rise to a "Strong**
       **Inference" of Scienter.**
12

13   　　Plaintiffs also fail to plead a "strong inference" of scienter—a "mental state embracing

14   intent to deceive, manipulate, or defraud," *Ernst & Ernst*, 425 U.S. at 193 n.12; *Tellabs*, 551 U.S.

15   at 319, 322-23—as to any Defendant.  The SAC should be dismissed for this independent reason.

16   　　Scienter must be properly pled for each false or misleading statement. 15 U.S.C.

17   § 78u-4(b)(2)(B).  Because a defendant can be held liable only for a statement he makes, a

18   plaintiff must properly allege both who made the challenged statement and that the statement-

19   maker acted (1) knowing that the statement was false at the time he made it, or (2) with

20   "deliberate recklessness." *Zucco*, 552 F.3d at 991 (citation omitted).

21   　　A statement is attributable to a defendant only where the complaint presents facts showing

22   that the particular defendant had "ultimate authority" over the "content of the statement" and over

23   "whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564

24   U.S. 135, 142 (2011).  To show that the statement-maker acted with deliberate recklessness, a

25   plaintiff must plead facts showing a "danger of misleading buyers or sellers that [was] either

26   known to the defendant or [was] so obvious that the actor must have been aware of it." *NVIDIA*,

27   768 F.3d at 1053 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)

28   (en banc)); *see also Tellabs*, 551 U.S. at 314.  This standard is "actually much closer to one of

1    intent" and requires "intentional or conscious misconduct." *NVIDIA*, 768 F.3d at 1053.

2            Scienter allegations must be set out in "great detail," *In re Silicon Graphics, Inc. Sec.*

3    *Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), and must give rise to an inference of scienter that is both

4    "cogent" and "at least as compelling as any opposing inference one could draw from the facts

5    alleged." *Tellabs*, 551 U.S. at 324.  Dismissal is appropriate where, as here, the complaint fails to

6    allege "specific contemporaneous statements or conditions that demonstrate the intentional or the

7    deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d

8    at 432; *Metzler*, 540 F.3d at 1066.

9            The Ninth Circuit has set out a two-part approach for assessing allegations of scienter:

10   first, the allegations of scienter are analyzed separately; second, the court will "conduct a holistic

11   review" to determine whether all allegations in concert create a cogent and compelling inference

12   of fraud.  *Zucco*, 552 F.3d at 992.  Under a "holistic" analysis, a court "must consider, not only

13   inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the

14   facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other,

15   nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 314.

16           As shown below, Plaintiffs' allegations fail to give rise to a strong inference of scienter as

17   to the Individual Defendants or Yahoo.

18                            **1.       The 2013 Security Incident**

19           Plaintiffs make no attempt to show that any Defendant was aware of the 2013 Security

20   Incident before 2016.  The Company discovered the 2013 Security Incident after analyzing data

21   files provided to it by law enforcement in November 2016; and even with the benefit of that data,

22   Yahoo could not identify the source of the intrusion for the 2013 Security Incident.[19]  (¶ 102.)

23           Plaintiffs' *only* allegations that the "Defendants knew about the 2013 Data Breach" before

24   November 2016 are both, separately and together, insufficient to support Plaintiffs' claims.  First,

25   the SAC cites unsourced assertions that a third party told "Yahoo," through an unidentified

26   intermediary, in *August 2016* that a hacker group claimed to possess a Yahoo user database.

27

28   _____

[19]   As Mr. Stamos left Yahoo in 2015, he was no longer employed by Yahoo at this time.  (¶ 91.)

1  (¶¶ 98, 101.)  This is insufficient to show scienter for any Defendant even in August 2016, let

2  alone in 2013.  Plaintiffs plead no facts about who at Yahoo received this information, what

3  information the unidentified intermediary provided to "Yahoo," how (if at all) the information

4  related to the 2013 Security Incident, or whether it bore any indicia of reliability.  *See Police Ret.*

5  *Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) ("[N]egative

6  characterizations of reports relied on by insiders, without specific references to the contents of

7  those reports, are insufficient to meet the heightened pleading requirements.") (quoting *Lipton v.*

8  *Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002)).

9      Second, Plaintiffs assert that Defendants' supposed awareness in 2014 and 2015 regarding

10  the *2014* Security Incident was "sufficient to alert Defendants" that the user database for all three

11  billion user accounts had been compromised in the *2013* Security Incident.  (¶ 2, n.1.)  Plaintiffs,

12  however, plead no facts even suggesting a relationship between the two incidents.  Quite the

13  contrary.  Plaintiffs allege that as of December 2016, after an investigation, the Company

14  concluded that the 2013 Security Incident was ***likely distinct*** from the 2014 Security Incident.

15  (¶¶ 102, 408.)

16      The absence of allegations establishing that any Defendant was even aware of the 2013

17  Security Incident before November 2016 is fatal to Plaintiffs' claims on this topic.

**2.      The 2014 Security Incident**

19      The SAC alleges that "all material facts" about Yahoo's information security team's

20  efforts to investigate and remediate the 2014 Security Incident were shared broadly with "senior

21  management," which included, according to Plaintiffs, Ms. Mayer and Mr. Bell.  (¶¶ 142-48.)

22      The issue, however, is not "whether defendants had knowledge of certain undisclosed

23  facts."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751,

24  758 (1st Cir. 2011).  Instead, the dispositive question is "whether defendants knew or should have

25  known that their failure to disclose those facts" rendered the statements they made false or

26  misleading."  *Id.*; *see Rigel Pharm.*, 697 F.3d at 884 (finding scienter inadequately pled where the

27  plaintiffs did not demonstrate that the "defendants believed that they were making false or

28  misleading statements related to blood pressure" when they omitted cases of hypertension from a

1   chart of side-effects).  While the SAC contends that knowledge of cybersecurity issues can be

2   inferred, including from Ms. Mayer's cooperation with the FBI (¶ 205), Mr. Stamos' reports to

3   Ms. Mayer (¶ 149), and an account from a confidential witness (¶¶ 210-12), these allegations do

4   not support a strong inference that any challenged statement was made with intent to deceive

5   investors.  As discussed below, the SAC does not contain particularized factual allegations

6   supporting a strong inference that any statement was made with the intent to deceive investors.

7                                    **a.        Marissa Mayer**

8                          **(i)        Statements in 2013 and 2014**

9           Plaintiffs allege that Ms. Mayer made eleven statements between the start of the Class

10   Period and November 9, 2014, when Plaintiffs allege that the state-sponsored hackers exfiltrated

11   Yahoo user account data from Yahoo's network.  (Stmt. Nos. 2-3, 6-8, 10-11, 16-17, 25, 33.)

12   Plaintiffs have alleged no facts even suggesting that Ms. Mayer made these statements—made

13   before the 2014 Security Incident occurred and before *anyone* at Yahoo (much less Ms. Mayer)

14   knew of the 2013 Security Incident—with scienter.

15                          **(ii)        Statements in 2015 and 2016**

16          The context of the thirteen statements made after the 2014 Security Incident occurred are

17   inconsistent with a strong inference that Ms. Mayer spoke with the intent to deceive investors.

18   •   Seven are risk factor statements in Yahoo's SEC filings, which Plaintiffs allege were signed

19       by Ms. Mayer.  (Statement Chart Tab C; Stmt. Nos. 35, 41, 43, 48, 52, 55, 57.)  The risk

20       factors expressly warned investors that "***[s]ecurity breaches or unauthorized access have***

21       ***resulted in and may in the future result in a combination of significant legal and***

22       ***financial exposure***."  This is inconsistent with a strong inference that Ms. Mayer sought to

23       deceive investors about Yahoo's data security by concealing the fact that Yahoo's networks

24       had been breached.

25   •   Four are general aspirational statements about "privacy" and Yahoo's security efforts,

26       including a roundtable discussion on the effect of "Snowden and also the counterterrorism

27       problem."  (Statement Chart Tab G; Stmt. Nos. 36, 42, 45, 47.)  Ms. Mayer's discussion of

28       the effects of "Snowden's allegations," "encryption between datacenters," and a newly-

1    announced "Yahoo! Account Key" feature has nothing to do with the 2014 Security

2    Incident or Yahoo's exposure to data breaches more generally.  There are no particularized

3    factual allegations supporting a strong inference that the "'danger of misleading buyers or

4    sellers" of securities with these statements was "either known to the defendant or [was] so

5    obvious that the actor must have been aware of it.'"  *NVIDIA*, 768 F.3d at 1053.

6    • The remaining two statements are the allocation-of-risk representations included in the SPA.

7    (Statement Chart Tab D; Stmt. Nos. 56, 61.)  As discussed above, these statements are not

8    actionable.  Moreover, the fact that the SPA explicitly advised readers not to rely on it

9    supports an inference that it was not made with intent to induce reliance.  *See Glazer*, 549

10   F.3d at 748 (location of misrepresentation "undercuts any inference that [the defendant]

11   knew about the [false statement] when he signed the merger agreement").

12       In addition to the context of these statements being inconsistent with an intent to deceive,

13   the Independent Committee's findings, upon which Plaintiffs rely, undermine Plaintiffs' fraud

14   theory.  Specifically, the Independent Committee "did not conclude that there was an intentional

15   suppression of relevant information," but rather that "failures in communication, management,

16   inquiry and internal reporting contributed to the lack of proper comprehension and handling of

17   the 2014 Security Incident."  (Ex. 20 at 47.)  Plaintiffs' allegations about Yahoo "penalizing" Ms.

18   Mayer add nothing to their theory and in fact support the opposite inference.  Plaintiffs "point to

19   no particularized allegation refuting the reasonable assumption" that Ms. Mayer was not awarded

20   a bonus "simply because the errors that le[d] to the [2014 Security Incident] occurred on [her]

21   watch. . . . Any inference beyond that is unwarranted without more specific allegations."  *In re*

22   *U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073-74 (N.D. Cal. 2002).  Indeed, the

23   fact that Ms. Mayer remained as Yahoo's CEO until the closing of the Sale Transaction "further

24   diminishes any inference of scienter."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*

25   *v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017); *NVIDIA*, 768 F.3d at 1063.

26                          **(iii)    Stock sales**

27       Plaintiffs' only allegation regarding stock sales is that Ms. Mayer "sold at least 1.2 million

28   shares of Yahoo common stock at artificially inflated prices, for proceeds of more than $51

million" during the more than three-year Class Period.  (¶ 215.)  Stock sales by a corporate insider support an inference of scienter *only* when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005.  Plaintiffs fail to present the requisite "'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Id.* (citing *Vantive*, 283 F.3d at 1095-96).  Thus, these allegations contribute nothing.

### b. Ronald Bell

It is not even clear that Plaintiffs contend Mr. Bell acted with scienter.  The SAC asserts that Yahoo "self-servingly focused blame on the 'relevant legal team,' specifically Mr. Bell, Yahoo's General Counsel."  (¶ 213.)  And Plaintiffs allege that Yahoo's purported "condemnation" of Mr. Bell was "ridiculous" and that Mr. Bell "is a good man and as a lawyer he wasn't in charge of security."  (¶ 214.)  Such allegations imply that Mr. Bell acted with no fraudulent intent.

In any event, the facts pled in the SAC are wholly inadequate to support an inference of scienter on the part of Mr. Bell.  Plaintiffs attribute only six statements to Mr. Bell:

- Four are vague, generalized (inactionable) statements that Yahoo "take[s] the privacy of our users seriously" (¶ 252; Stmt. No. 4); the legal department's "main job is to protect our users" (¶ 271; Stmt. No. 12); "users come first at Yahoo . . . We are also committed to protecting users' data" (¶ 300; Stmt. No. 28); and "the security of [Yahoo] users' information is of paramount importance" (¶ 352; Stmt. No. 53).

- The other two address security issues unrelated to the Security Incidents:  Mr. Bell stated that Yahoo had committed to "introducing HTTPS (SSL – Secure Sockets Layer) encryption with 2048-bit keys across our network" (¶ 290; Stmt. No. 23) and that Yahoo "recently rolled out an end-to-end (e2e) encryption extension for Yahoo Mail" (¶ 322; Stmt. No. 53).

As explained above (*see* Sections II.C.1.b and II.C.2, *supra*), none of these is false or misleading.

Additionally, four of these statements (¶¶ 252, 271, 290, 300; Stmt. Nos. 4, 12, 23, 28) were made ***before the 2014 Security Incident had even occurred***.  And, as explained above,

1    Plaintiffs have pled no particularized facts showing that **anyone** at Yahoo—let alone Mr. Bell—

2    knew of the 2013 Security Incident before December 2016.  Thus, these statements could not

3    have been made with scienter.

4         Plaintiffs attribute only **two statements** to Mr. Bell that were made in February 2015 or

5    later.  (¶¶ 322, 352; Stmt. Nos. 39, 53.)  Plaintiffs have alleged no particularized facts establishing

6    a strong inference that Mr. Bell was seeking to deceive Yahoo investors when he made these two

7    statements, neither of which has anything to do with the Security Incidents.  *See Rigel Pharm.*,

8    697 F.3d at 884.  Statement 39—"At Yahoo, users always come first"—is classic puffery.  (¶ 322;

9    *see Intuitive Surgical*, 759 F.3d at 1060.)  Mr. Bell goes on to say that Yahoo has "encrypted

10   many of our most important products."  Plaintiffs have presented no facts showing that this

11   statement was false, much less that Mr. Bell acted with an intent to deceive investors.[20]  End-to-

12   end encryption was unrelated to the 2014 Security Incident.  (¶ 322.)  Likewise, Statement 53 is

13   also a nonactionable statement that "the security of [Yahoo] users' information is of paramount

14   importance," made in the context of Bell's discussion of the FBI's attempt to compel **Apple**—not

15   Yahoo—to "pick the lock" of the iPhone owned by the suspect in the San Bernardino terrorist

16   shooting.  (¶ 352; Stmt. No. 53; Ex. 11.)

17        Conspicuously absent from the SAC is any allegation that Mr. Bell had any motive to

18   engage in securities fraud.  Plaintiffs do not allege that Mr. Bell sold any Yahoo stock, much less

19   that he sold it in suspicious amounts or at suspicious times.  Accordingly, the allegations against

20   Mr. Bell are insufficient to state a claim and should be dismissed.

21                                    **c.      Alexander Stamos**

22        Plaintiffs' allegations against Mr. Stamos fail to demonstrate any conflict between his

23   understanding of the 2014 Security Incident and his challenged statements.

24        As an initial matter, Plaintiffs fail to explain why Yahoo in March 2014 (¶ 17)—in the

25

26   [20]  Plaintiffs also point to Mr. Bell's resignation, and allege that "no payments [were] made to Mr.
     Bell in connection with his resignation."  (¶ 125.)  But, as with Ms. Mayer, Plaintiffs "point to no
27   particularized allegation refuting the reasonable assumption" that Mr. Bell was penalized "simply
     because the errors that le[d] to the [2014 Security Incident] occurred on his watch."  *U.S.*
28   *Aggregates*, 235 F. Supp. 2d at 1073-74.  "Any inference beyond that is unwarranted."  *Id.*

1    midst of allegedly covering up the "massive" 2013 Security Incident—would hire Mr. Stamos,

2    who by Plaintiffs' own admission "had a reputation for pushing for privacy and antisurveillance

3    measures." (¶ 91.)  Nor do Plaintiffs explain why Mr. Stamos would risk this reputation to

4    engage in a securities fraud scheme.  As with Mr. Bell, there are no allegations that Mr. Stamos

5    engaged in insider trading, or profited in any way from the alleged cover-up.  This complete

6    absence of motive undermines Plaintiffs' scienter theory and, in fact, "supports the opposite

7    inference." *Rigel Pharm.*, 697 F.3d at 885.

8          Moreover, the context and timing of Mr. Stamos' purported statements undermine any

9    inference of scienter.  Plaintiffs challenge six statements allegedly attributable to Mr. Stamos.

10   (¶¶ 274-75, 284-88, 292, 297-98, 306, 318; Stmt. Nos. 13-14, 18-22, 24, 26-27, 37.)  Five of

11   these statements were made ***before*** the 2014 Security Incident even occurred.  (¶¶ 274-75,

12   284-88, 292, 297-98, 306; Stmt. Nos. 13-14, 18-22, 24, 26-27.)

13         The ***only*** allegedly false statement attributed to Mr. Stamos after the 2014 Security

14   Incident occurred—a March 15, 2015 statement in which he vaguely discussed the

15   implementation of an end-to-end encryption extension for Yahoo Mail, Yahoo's commitment to

16   protecting users' security, and Yahoo's efforts to build "the best products"—is an inactionable

17   statement of corporate optimism unrelated to the Security Incidents.  (¶ 318; Stmt. No. 37.)

18   Plaintiffs plead no particularized facts supporting a strong inference that Mr. Stamos intended to

19   deceive investors when making this statement.  As discussed above, the "key question . . . is not

20   whether defendants had knowledge of certain undisclosed facts, but rather whether defendants

21   knew or should have known that their failure to disclose those facts present[ed] a danger of

22   misleading buyers or sellers" of securities.  *Waters Corp.*, 632 F.3d at 758; *see Rigel Pharm.*, 697

23   F.3d at 884 (finding scienter inadequately pled where plaintiffs did not demonstrate that

24   "defendants *believed* that they were making false or misleading statements related to blood

25   pressure" when they omitted cases of hypertension from a chart of side-effects).  Plaintiffs make

26   no such showing with respect to Mr. Stamos, whose job was unrelated to communicating with the

27   investment community.  Nor is his vague statement one on which investors would rely.  *Intuitive*

28   *Surgical*, 759 F.3d at 1060.

1    Mr. Stamos' position at Yahoo undermines an inference that he spoke with an intent to

2    deceive investors.  As CISO, Mr. Stamos' statements were predominantly made on Yahoo's

3    security blog and at information security events, not at investor-facing presentations or on

4    earnings conference calls.  (Stmt. Nos. 13-14, 24, 26-27, 32, 37.)  Plaintiffs plead no facts

5    showing that, in this context, Mr. Stamos "knew or should have known that [his] failure to

6    disclose [the allegedly omitted information] presented a danger of misleading investors."  *Waters*

7    *Corp.*, 632 F.3d at 758 (internal quotation marks omitted); *see also Petrie v. Elec. Game Card,*

8    *Inc.*, 2011 WL 13130015, at *7 (C.D. Cal. Oct. 19, 2011) ("[C]ulpability is based on *intent*, not

9    mere knowledge."); *LifeLock*, 690 Fed. App'x at 954.

10            **d.      Yahoo**

11           Pleading corporate scienter requires, at a minimum, satisfying the requirements of

12   *respondeat superior* liability.[21]  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th

13   Cir. 2015); *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th Cir. 1995).

14   Plaintiffs must plead facts showing that a corporate officer, while acting on Yahoo's behalf,

15   violated Section 10(b).  *ChinaCast*, 809 F.3d at 475-76.  Under Ninth Circuit law, a "corporation

16   is deemed to have the requisite scienter for fraud only if the individual corporate officer making

17   the statement has the requisite level of scienter."  *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d

18   938, 952 (D. Ariz. 2017).  As discussed above, Plaintiffs fail to make that showing with respect to

19   any Individual Defendant.

20           For statements that Plaintiffs attribute to a non-Defendant (Stmt. Nos. 5, 9, 15, 34, 40, 44,

21   54), Plaintiffs fail to plead ***any*** facts concerning the statement maker's knowledge or intent.

22   Plaintiffs have not, therefore, shown that the makers acted with scienter.  Under these

23   circumstances, Plaintiffs cannot plead a Section 10(b) claim against Yahoo.  *In re Int'l Rectifier*

24   *Corp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 44872, at *66 (C.D. Cal. May 23, 2008) ("[F]or scienter

25

26   ──────────────────
     [21]  In light of the Supreme Court's repeated rejections of attempts to establish secondary liability
27   under Section 10(b)—*see, e.g.*, *Stoneridge*, 552 U.S. at 158; *Cent. Bank of Denver, N.A. v. First*
     *Interstate Bank, N.A.*, 511 U.S. 164, 185 (1994)—it is unclear whether the *respondeat superior*
28   theory remains viable.  While Yahoo does not raise this issue in this Motion, it does not concede
     that *respondeat superior* is a valid theory and reserves the right to challenge it at a later time.

1  to be attributed to [the company], [p]laintiffs must sufficiently plead that at least one of [the
2  defendant company's] officers had the requisite scienter at the time ***they made the allegedly***
3  ***misleading statements***." (emphasis added)).

4       Twelve of Plaintiffs' challenged statements are not attributed to ***any*** individual—
5  Defendant or otherwise.  (Stmt. Nos. 1, 29-31, 38, 46, 49-51, 58-60.)  This method of pleading
6  "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be
7  set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each
8  act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the
9  required state of mind.'"  *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353,
10  363-67 (5th Cir. 2004); *see also Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d
11  1328, 1354-55 (C.D. Cal. 2014) (compiling cases).  Plaintiffs cannot establish their Section 10(b)
12  claim without particularized allegations establishing who made these unattributed statements and
13  the maker's contemporaneous state of mind.

14       **E.       Plaintiffs' Claims Should Also Be Dismissed for Failure to Plead Loss**
15                   **Causation and Damages.**

16       In addition to the fatal deficiencies identified above, the SAC fails to plead the essential
17  elements of loss causation and damages with respect to any Plaintiff.  On these additional
18  grounds, it should be dismissed.

19                   **1.       Maher has not pled loss causation.**

20       Loss causation is the "causal connection between the material misrepresentation and the
21  loss."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Loos*, 762 F.3d at 888.
22  To plead loss causation in a case governed by the Reform Act, a plaintiff must plead that (1) he
23  purchased a security at a market price that was artificially inflated by a fraudulent
24  misrepresentation; (2) the artificial inflation was removed from the market price as a result of a
25  corrective disclosure; and (3) he continued to hold the security through the date of the corrective
26  disclosure.  *Dura*, 544 U.S. at 342; *Loos*, 762 F.3d at 888.  The release of negative information,
27  alone, is not enough to satisfy the loss causation requirement.  Rather, a plaintiff must "trac[e] the
28  loss back to ***the very facts about which the defendant lied***."  *Mineworkers' Pension Scheme v.*

*First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction."); *Metzler*, 540 F.3d at 1063 (rejecting assertion that loss causation is proved by showing that the market reacted to the purported impact of the alleged fraud rather than to the fraudulent acts themselves); *Apollo*, 774 F.3d at 608 (a plaintiff must show that a corrective disclosure "reveal[ed] fraudulent practices to the market place" and that the defendants' previous statements were "made untrue or called into question by subsequent public disclosures"). Rule 9(b) requires that facts supporting allegations of loss causation be pled with particularity. *Apollo*, 774 F.3d at 605.

Here, the first potential corrective disclosure occurred on September 22, 2016, when Yahoo announced the 2014 Security Incident. (¶ 394.) Maher, who traded in options and not stock, either had sold his options or his options had expired by February 19, 2016. (*See* Ex. 27 at 13-3, pp. 1-6; ¶ 13.) Maher has not, therefore, pled loss causation.

Maher attempts to avoid dismissal on this ground by asserting—without explanation—that the following eleven disclosures preceding the September 22, 2016 announcement of the 2014 Security Incident constitute corrective disclosures:

- A May 18, 2015 press report on the departure of Yahoo's CISO, Mike Kail. (¶ 373.)
- A July 28, 2015 Yahoo announcement that Yahoo had paid one million dollars in bonuses in its "bug bounty" program. (¶ 375.)
- A September 11, 2015 press report that Yahoo's interim CISO had left Yahoo. (¶ 377.)
- A September 14, 2015 press report that some Yahoo Messenger emoticon downloads contained a security vulnerability. (¶ 378.)
- A December 2, 2015 Yahoo announcement that Yahoo would review the possibility of selling its operating business. (¶ 380.)
- A January 4, 2016 press announcement of an impending proxy contest. (¶ 382.)
- A January 20, 2016 press report of a scripting vulnerability in Yahoo Mail. (¶ 384.)
- A January 23, 2016 press report that Verizon had made a bid for Yahoo's operating assets, followed by a denial from Verizon. (¶ 386.)
- A February 2, 2016 Yahoo announcement of a goodwill impairment charge relating to the carrying value of Yahoo's U.S. & Canada, Europe, Tumblr, and Latin America reporting units. (¶ 388.)
- A May 19, 2016 press report on rumors about bids for Yahoo's operating assets. (¶ 390.)

1

2

- A July 24, 2016 press report of a rumor that Verizon had agreed to buy Yahoo's operating assets.  (¶ 392.)

3

4

5

6

7

8

These statements are entirely unrelated to Plaintiffs' theory that Yahoo's stock price "plummeted" when "the market learned of the data breaches" (¶ 7), and Plaintiffs make no attempt to meet their burden of "tracing the [alleged] loss back to the *very facts* about which the defendant lied."  *First Solar*, 881 F.3d 750, at 753.  Attaching the conclusory label "corrective disclosure" to these reports achieves nothing.  Labels do not change the analysis under Rule 8, much less Rule 9(b).  Maher's claims should be dismissed for failure to plead loss causation.

9

10

### 2. Sutton View's claim is barred by the Reform Act's damages limitation.

11

12

13

14

Lead Plaintiff Sutton View held its Yahoo common stock in two separate accounts during the Class Period.  (Ex. 27 at 13-3, pp. 6-9.)  All shares held in "Account 1" were sold on or before March 8, 2016.  (*Id.*)  As with Lead Plaintiff Maher, therefore, Sutton View cannot establish loss causation with respect to these shares.

15

16

17

18

19

20

21

22

23

Sutton View held one hundred shares in its "Account 2" through the end of the Class Period.[22]  (*Id.*)  However, these one hundred shares do not save its claim because the Reform Act "limits the amount of damages that plaintiffs can recover at trial to the difference between the purchase price and the average trading price during the 90-day period following the corrective disclosure."  *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 967 n.3 (9th Cir. 2007); 15 U.S.C. § 78u-4(e)(1).  "Thus, if the mean trading price of a security during the 90-day period following the correction is *greater* than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages."[23]  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (emphasis in original); *In re Vivendi*

24

25

26

[22]  Sutton View sold all other shares held in this account by May 9, 2016.  (Ex. 27 at 13-3, pp. 6-9.)  Similarly, all of Sutton View's options either were sold or expired by April 15, 2016.  (*Id.*)  As with Maher, Sutton View cannot establish loss causation with respect to these shares.  *Dura*, 544 U.S. at 342.

27

28

[23]  The Reform Act defines "mean trading price" as the "average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period."  15 U.S.C. § 78u-4(e)(3).

1  *Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 438-39 (S.D.N.Y. 2015).

2  Here, the final alleged corrective disclosure date identified in the SAC is January 5, 2017.

3  (¶ 411.)  The average closing price of Yahoo's stock during the 90-day period following that date

4  was $44.87.  (Lobdell Decl. ¶ 16.)  All the shares purchased in Sutton View's Account 2,

5  however, were purchased at or below $36.42, well below the bounce-back threshold.  (Ex. 27 at

6  13-3, pp. 7-8.)  Thus, Sutton View is not entitled to recover damages.  *See Mego*, 213 F.3d at 461;

7  *Vivendi*, 123 F. Supp. 3d at 438-39.  Sutton View's failure to plead loss causation or damages

8  requires dismissal of its claims.  *Dura*, 544 U.S. at 342; *Paracor Fin., Inc. v. GE Capital Corp.*,

9  96 F.3d 1151, 1157 (9th Cir. 1996) ("If one of these elements is missing, the Investors' claim

10  fails.").

11          **3.      Talukder's claim is barred by the Reform Act's damages
                        limitation.**

13  Talukder, too, has pled no recoverable damages.  His Class Period sales all took place on

14  or before July 17, 2015, more than one year before the September 22, 2016 announcement of the

15  2014 Security Incident, so he cannot establish loss causation as to these sales.  (Ex. 28 at 36.)

16  Talukder did not sell all his Yahoo stock, though.  He held 1,013 Yahoo shares through the end of

17  the Class Period.  (*Id.*)  All but three of Talukder's purchases, however, were made at prices

18  below the 90-day bounce-back threshold of $44.87.  (*Id.*; Lobdell Decl., ¶ 16.)  For the reasons

19  discussed above, Talukder is not entitled to damages with respect to shares purchased below the

20  bounce-back threshold.

21  Talukder made three Class-Period purchases at levels above the 90-day bounce-back

22  threshold of $44.87.  These three purchases, however, do not save Talukder's claim because they

23  were all made between November 4 and 6, 2014.  (Ex. 28 at 36.)  Plaintiffs concede that the

24  hackers did not exfiltrate Yahoo user data as part of the 2014 Security Incident until ***November***

25  ***10, 2014***.  (¶ 142.)  Thus, even accepting Plaintiffs' theory, these purchases occurred ***before*** the

26  2014 Security Incident even took place, much less when it could have been disclosed to the

27

28

1  public.[24]  Similarly, Plaintiffs do not allege that the 2013 Security Incident was known to anyone

2  (other than the hackers) until 2016.  Talukder, therefore, has not pled—and cannot plead—that

3  these three purchases were made in reliance on Defendants' fraudulent concealment of the

4  Security Incidents.  *See Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992).

5       As neither Talukder nor the Lead Plaintiffs have stated a claim upon which relief can be

6  granted, the SAC should be dismissed on this ground, as well.  The SAC's class action allegations

7  (¶¶ 418-26) do not remedy Plaintiffs' failure to state a claim.[25]

8       **III.    THE SECTION 20(a) CLAIMS SHOULD BE DISMISSED.**

9       To state a claim under Section 20(a), Plaintiffs must establish (1) "a primary violation of

10  federal securities law" and (2) "that the defendant exercised actual power or control over the

11  primary violator."  *NVIDIA*, 768 F.3d at 1052; *Zucco*, 552 F.3d at 990.  Section 20(a) claims must

12  satisfy the particularized pleading requirements of Rule 9(b).  *In re Volkswagen "Clean Diesel"*

13  *Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 1109, at *856 (N.D. Cal.

14  Jan. 4, 2017); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1101 n.12

15  (C.D. Cal. 2008); *Howard v. Hui*, 2001 U.S. Dist. LEXIS 15443, at *13-14 (N.D. Cal. Sept. 24,

16  2001).

17       Plaintiffs' control-person claims under Section 20(a) should be dismissed for two reasons.

18  First, Plaintiffs have failed to plead a primary violation of the Exchange Act.  *Rigel Pharm.*, 697

19  F.3d at 886.  Second, Plaintiffs have alleged no facts, particularized or otherwise, establishing for

20  Section 20(a) that Mr. Bell or Mr. Stamos exercised actual control over a primary violator.  *See In*

21  *re Invensense, Inc. Sec. Litig.*, 2016 U.S. Dist. LEXIS 40607, at *24 (N.D. Cal. Mar. 28, 2016).

22       The SAC contains only vague and conclusory allegations that "the Individual Defendants,"

23

24  [24]  While Plaintiffs contend that the information security team detected an "intrusion" on October 9, 2014 (¶ 142), there are no allegations to support a theory that this intrusion warranted

25  disclosure.  Moreover, Plaintiffs do not contend that any allegedly false and misleading statements were made between October 9, 2014, and the dates of Talukder's purchases.

26  [25]  To proceed as a class representative, a plaintiff must show that it personally has been injured, "not that injury has been suffered by other, unidentified members of the class to which [it]

27  belong[s] and which [it] purport[s] to represent."  *Warth v. Seldin*, 422 U.S. 490, 503 (1975).  If a plaintiff fails to state an individual claim, that plaintiff cannot proceed to represent the purported

28  class.  *In re Impax Labs., Inc. Sec. Litig.*, 2008 WL 1766943, at *6 (N.D. Cal. Apr. 17, 2008).

as a group, "participated in the operation and management of Yahoo" and "[b]ecause of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, statements, press releases and public filings." (¶¶ 437-41.)  Bare legal conclusions and boilerplate language alleging "control" over a primary violator are insufficient to overcome a motion to dismiss.  *City of Westland Police and Fire Ret. Sys. v. Sonic Solutions*, 2009 U.S. Dist. LEXIS 33339, at *31 (N.D. Cal. Apr. 6, 2009).  Such "allegations are conclusory and not entitled to a presumption of truth."  *Richardson v. Oppenheimer & Co. Inc.*, 2014 U.S. Dist. LEXIS 43419, at *34 (D. Nev. Mar. 31, 2014).  Indeed, judicially noticeable facts demonstrate that they are ***not true***.  For example, neither Mr. Bell nor Mr. Stamos signed Yahoo's Forms 10-Q and 10-K filed with the SEC.  And Plaintiffs have pleaded no facts suggesting that Mr. Bell or Mr. Stamos "played any role in issuing any public statements or disclosures nor that [they] had the authority to do so."  *Neborsky v. Valley Forge Composite Techs., Inc.*, 2014 U.S. Dist. LEXIS 104681, at *32-33 (S.D. Cal. July 29, 2014).

Plaintiffs' boilerplate allegations rest solely on reciting the Individual Defendants' positions at Yahoo, lacking any facts that "suggest how that authority was manifested."  *Neborsky*, 2014 U.S. Dist. LEXIS 104681, at *33.  The positions alone "do[] not create any *presumption* of control" and do not, therefore, "sustain an allegation of control person liability."  *In re Oak Tech. Sec. Litig.*, 1997 U.S. Dist. LEXIS 18503, at *14 (N.D. Cal. Aug. 1, 1997) (emphasis in original).

Plaintiffs' failure to allege "the specific circumstances of [the Individual Defendants'] alleged control" is fatal to their Section 20(a) claims.  *Volkswagen*, 2017 U.S. Dist. LEXIS 1109, at *856-58; *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1202 (D. Or. 2015).

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

1   Dated: March 2, 2018                    JORDAN ETH
                                            JUDSON E. LOBDELL
2                                           MORRISON & FOERSTER LLP

3
                                       By:   /s/ *Judson E. Lobdell*
4                                            JUDSON E. LOBDELL

5                                            Attorneys for Defendants
                                             YAHOO! INC. and MARISSA
6                                            MAYER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28